DISSENT
COLE, Circuit Judge,
dissenting.
As Ronald Post faced a possible death sentence on charges of aggravated robbery and aggravated murder, his counsel advised him to forego all of his trial rights and plead no contest, without any indication from either the prosecution or the three-judge sentencing panel that this would do anything to help spare his life. Following his no-contest plea, and leading up to his sentencing hearing, his attorneys then failed to conduct an independent investigation into circumstances that might mitigate against the imposition of the death penalty. Further, at the sentencing hearing itself, his counsel requested that a member of the victim’s family be permitted to speak. Because of this choice by his attorney, the last testimony heard by the three-judge panel which sentenced him to death was the victim’s son discussing how his mother had been murdered just ten days before Christmas — the first Christmas she would have had off work in thirteen years — and his belief that “the only just punishment for execution is execution.” (J.A., vol. 4, at 913-14.) Additionally, following Post’s sentencing, new evidence came to light indicating that Richard Slusher — the jailhouse informant whose pretrial testimony about Post’s confession loomed large over the decision not to go to trial — had intentionally elicited the confession from Post at the direction of the prosecutors, in violation of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).
I respectfully dissent from the majority’s opinion because I believe that Post’s counsel was constitutionally infirm both in advising him to plead no-contest and at the sentencing stage. Further, I believe we should remand to the district court to hold an evidentiary hearing on Post’s Massiah claim.
I.
In analyzing Post’s claim that he received ineffective assistance of counsel when he was advised to plead no contest, the majority concludes that the Ohio Supreme Court unreasonably applied Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The majority finds that neither justification offered by that court — that Post inevitably would have been found guilty had he gone to trial and that pleading no contest allowed him to preserve the issue regarding the admissibility of Robert Holmok’s testimony — provided a constitutionally cognizable benefit. I agree with this analysis. However, reviewing the issue de novo, the majority then concludes that Post’s trial counsel’s advice to plead no contest was objectively reasonable because there was “hope that the plea would be considered a mitigating factor.” I disagree. While I acknowledge that Post’s attorneys were in an unenviable position — there was strong evidence of their client’s guilt, but he had refused to plead guilty — I believe that the Constitution requires attorneys to make strategic judgments based on something more concrete than unsubstantiated hope, especially when their client’s life hangs in the balance.
At the time Post pleaded no contest, he was represented by two attorneys: Michael Duff and Lynett McGough. Al *429 though both Duff and McGough initially advised Post to plead guilty, once he refused, Duff advised him to plead no contest to preserve the Holmok admissibility issue for appeal and because Duff did not think that Post would be sentenced to death if he pleaded no contest. Prior to the sentencing hearing, McGough polled the three judges sitting on the panel to see if they would consider a no-contest plea a mitigating factor and if they were opposed morally to the death penalty. Two of the judges explicitly told McGough that they would not consider a no-contest plea as a mitigating factor. The third judge indicated some moral concern about imposing the death penalty based on his religious beliefs, but McGough concluded that he, as well as the other two judges, would be willing to impose the death penalty. Based on these conversations, McGough stated that her “feeling was if we entered the no contest plea then the Judges would impose the death penalty.” (J.A., vol. 4, at 995.) Therefore, she continued to advise Post to change his plea to a guilty plea even after the no-contest plea had been entered. In contrast, Duff advised Post to plead no contest. As is apparent, Post followed Duffs advice and entered a no-contest plea.
I believe that Post’s counsel was ineffective in advising him to plead no contest without any guarantee that it would help spare his life. The 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (the “ABA Guidelines”) advise that attorneys representing defendants facing the death penalty “should insist that no plea to an offense for which the death penalty can be imposed will be considered without a written guarantee, binding on the court or other final sentencer, that death will not be imposed.” ABA Guidelines 11.62 cmt. Further, they recommend that “[i]f no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client’s trial rights,” and that “counsel must strive to prevent a ... client from pleading guilty where there is a likelihood that such a plea will result in a death sentence.” Id. 11. 6.3 cmt. The 2003 version of the these guidelines offer similar guidance. See ABA Guidelines 10.9.2 cmt. (rev. ed.2003). Indeed, citing the 2003 ABA Guidelines, the Supreme Court has stated:
[Pjleading guilty [to a capital offense] without a guarantee that the prosecution will recommend a life sentence holds little if any benefit for the defendant. Pleading guilty not only relinquishes trial rights, it increase the likelihood that the State will introduce aggressive evidence of guilt during the sentencing phase, so that the gruesome details of the crime are fresh in the jurors’ minds as they deliberate on the sentence.
Florida v. Nixon, 543 U.S. 175, 191 n. 6, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004).[1]
*430 Post’s attorneys undoubtedly found themselves in a difficult position. “Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant’s guilt is often clear.... In such cases, ‘avoiding execution [may be] the best and only realistic result possible.’ ” Id. at 191 (quoting ABA Guidelines 10.9.1 cmt. (rev. ed.2003)). However, I believe that the Constitution required Post’s counsel to make a strategic judgments based on something more concrete than an unsubstantiated hope that his no-contest plea would be considered a mitigating factor, particularly because their client’s life was on the line. Curiously, the majority opinion never explains why pleading no-contest would be considered a mitigating factor. Indeed, as the majority points out that, because death penalty verdicts must be unanimous under Ohio law, Post essentially lost nine potential “no” votes by choosing a three-judge panel over a jury. Further, there are other possible negative implications that a no-contest plea might carry. For example, the three-judge panel could have viewed Post’s no-contest plea as acknowledgment from Post that he killed Vantz, but a stubborn refusal to accept responsibility for his crime.
Further, the majority provides no explanation for why the ABA Guidelines’ recommendation should be disregarded. Following Supreme Court precedent, this Court specifically has held that the ABA Guidelines should be used as a guide to determining the standards of reasonable representation in death penalty cases, even in cases that predate their adoption. See Hamblin v. Mitchell, 354 F.3d 482, 486-88 (6th Cir.2003); see also Padilla v. Kentucky, — U.S.-,-, 130 S.Ct. 1473, 1482, 176 L.Ed.2d 284 (2010) (reaffirming that the ABA Guidelines should serve as guides for courts analyzing the constitutional-deficiency prong of Strickland claims). In this situation, the ABA Guidelines’ recommendation is clear. In following their guidance we do not, as the majority seems to suggest, need to adopt them as per se rules. Rather, as both this Court and the Supreme Court has stated repeatedly, we look to them for guidance in determining whether counsel’s representation was constitutionally inadequate.
“A guilty or no-contest plea involves a waiver of many substantial constitutional rights ....” Fautenberry v. Mitchell, 515 F.3d 614, 636-37 (6th Cir.2008). Here, Post was advised to waive those rights in exchange for nothing more than a hope that his no-eontest plea would be considered mitigating. I imagine that Post may have gained some comfort in knowing that his attorney hoped his no-contest plea would be treated as a mitigating factor. But this comfort was short-lived. Post’s counsel’s foremost duty in that situation was not to keep hope alive, but to keep Post alive. Viewed in this light, it certainly was unreasonable to advise him to plead no contest and waive all of his trial rights without a guarantee, or at least some concrete indication, that doing so might help spare his life.
For Post to succeed on this claim he would, of course, still have to demonstrate prejudice. Because Post’s claim is based on his counsel’s advice to plead no contest, “in order to satisfy the ‘prejudice’ requirement, [he] must show that there is a reasonable probability that, but for counsel’s errors, he would not have pleaded guilty and would have insisted on going to trial.” Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. *431 366, 88 L.Ed.2d 203 (1985); see also Railey v. Webb, 540 F.3d 393, 415-16 (6th Cir.2008). At the state post-conviction hearing, Post testified that he wanted a jury a trial and that, had he believed receiving the death penalty was a possibility, he would not have pleaded no contest. Further, Post already had refused to plead guilty, adding more credence to the proposition that he would have insisted on going to try but for his counsel’s ineffective advice to plead no contest.
II.
Post also claims that he received ineffective assistance of counsel during the penalty phase of his state-court proceedings. Below, the district court concluded that the Ohio Supreme Court unreasonably applied Strickland in rejecting this claim because Post’s “[d]efense counsel did not make a strategic decision not to present certain evidence in mitigation or an informed decision not to investigate certain facts. Instead, Mr. Duff and Ms. McGough failed to do any independent investigation into Mr. Post’s background in preparation for the mitigation hearing.” (Dist.Ct.Op.143.) Rather than conducting an independent investigation into possible mitigation evidence, Post’s counsel completely relied upon a presentence investigation report prepared by the probation department. For example, leading up to the sentencing hearing, Post’s lawyers failed to interview his family members and friends in order to obtain background information on him, failed to follow leads about potential character witnesses, and failed to obtain records and collateral information to adequately research his background. Indeed, the family witnesses who did testify on his behalf at the sentencing hearing (his mother, stepmother, and common-law wife, respectively), submitted affidavits stating that defense counsel spent only ten minutes preparing them to testify, as a group, immediately before the hearing.
Further, the district court concluded that McGough performed deficiently at the sentencing hearing itself by calling the victim’s son, William Vantz, to testify when she “should have known that [the son’s] statement would be damaging to her client and that Ohio law did not require [the son] to be given an opportunity to make his statement.” (Id. at 151.) William Vantz stated that his mother “was a caring, loving woman who would do anything for anyone. She never hurt anyone; she would never, ever hurt anyone.” (J.A., vol. 4, at 912-13.) He also described how his mother, who was murdered ten days before Christmas, was not scheduled to work on Christmas for the first time in her thirteen years working at the Slumber Inn and how she had plans to spend the day with her son and only grandson. He stated further that “she was full of life----She enjoyed her life to the fullest, and for it to be taken in such a way is just inexcusable.” (Id. at 913.) He concluded:
She was executed, and I feel the only just punishment for execution is execution. My family feels that way, my cousins, my brothers, our wives, friends of the family.
We loved that woman, as did everyone that came in touch with her. A part of my life left when she left, and that will never come back.
I’m going to leave it in your hands to do what’s right, what’s just. I’m not versed in the law, but yet in my heart I feel the only thing to do is to give Mr. Post what he deserves.
(Id. at 913-14.)
The majority concludes that despite this performance by his counsel at the penalty phase, Post’s claim fails because he cannot *432 meet Strickland’s prejudice requirement. See Strickland, 466 U.S. at 692, 104 S.Ct. 2052. However, “when a client faces the prospect of being put to death unless counsel obtains and presents something in mitigation, minimal standards require some investigation.” Mapes v. Coyle, 171 F.3d 408, 426 (6th Cir.1999). In Mopes, this Court held that the defendant had been prejudiced by his counsel’s failure to conduct a mitigation investigation because even though the evidence that went unpresented during the penalty phase was, at best, “slim evidence of mitigation, ... it [was] something. And what is most important, it was [the defendant’s] only shield from a death sentence.” Id. Post’s habeas counsel has presented mitigating evidence describing the inadequate parenting he received as a child, the inappropriate and inadequate discipline he received, and his self-consciousness about being overweight, which led to abuse of diet pills. As in Mopes, although this certainly is not the most dramatic mitigating evidence, it is something. I believe that had this evidence been presented, had Post’s family witnesses who did testify been adequately prepared, and had Post’s counsel not called the murder victim’s son as the final witness to testify, “there is a reasonable probability that ... the result of the proceeding would have been different,” Strickland, 466 U.S. at 694, 104 S.Ct. 2052, that is, one of the three judges would have voted not to impose the death penalty.
III.
Finally, I disagree with the majority’s treatment of Post’s Massiah claim. While Post was being held in jail pretrial, he confessed to a fellow inmate, Richard Slusher. Specifically, Post told Slusher that he previously had confessed to Robert Holmok, polygraph examiner hired by Post’s attorneys, and that his confession was true. Slusher relayed this information to the prosecution. At a pretrial hearing, the trial court ruled that the attorney-client privilege did not protect Post’s communications with Holmok because Post’s disclosure of those communications to Slusher acted as a waiver of the privilege. Thus, Holmok could be called to testify about Post’s confession at trial. The prospect of Holmok — who aside from being a polygraph examiner also was employed as a police detective — testifying against Post appears to have played a significant factor in Post’s and Post’s counsel’s evaluation of his likelihood of success at trial.
At the pretrial hearing, Slusher testified that he did not reveal Post’s confession to prosecutors in order to gain favor in relation to his own pending cases. Further, he testified that he did not initiate the conversation with Post where Post revealed his confession to Holmok. However, evidence discovered only after this hearing undermined both of these claims. First, there are letters from prosecutors indicating that Slusher did in fact receive consideration from the State in exchange for his role in revealing Post’s confession, namely, the dismissal of two charges against him and the State’s decision not to oppose Slusher’s request for shock probation. Second, there is an affidavit from Slusher’s attorney, Michael Tully, stating that “it was determined by the Lorain County Prosecutor’s Office that Richard Slusher would intentionally elicit statements from Ronald Post concerning his Aggravated Murder case.” (J.A., vol. 9, at 2513.)
“Generally, a habeas petitioner is entitled to an evidentiary hearing in federal court if the petition alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing.” Stanford v. Parker, 266 F.3d 442, 459 (6th Cir.2001). Under Massiah, state agents *433 are prohibited from intentionally eliciting confessions from suspects after they have been indicted in the absence of their counsel. See Massiah, 377 U.S. at 206, 84 S.Ct. 1199; see also United States v. Henry, 447 U.S. 264, 272-75, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (holding that Massiah applies in cases involving jailhouse informants). Thus, if Slusher actively elicited Post’s confession, rather than having passively received it, Post would have a viable Massiah claim. Here, the evidence revealed since the pretrial hearing indicates that there is a factual dispute as to whether Slusher actively elicited Post’s confession. Indeed, it is uncontested that Slush-er received consideration for passing Post’s confession along to the prosecution and, by way of Tully’s affidavit, there is evidence that prosecutors asked him to elicit such statements from Post. Under these circumstances, I would find that the district court abused its discretion in denying Post an evidentiary hearing to develop his Massiah claim further.
IV.
Based on the foregoing reasons, I dissent.

. In Nixon, the Supreme Court held that it was not per se unreasonable for a capital defendant’s counsel to concede guilt during trial without the express consent of an uncooperative defendant, in order to focus on mitigation at the penalty phase. Nixon, 543 U.S. at 191-92, 125 S.Ct. 551. This case differs in two important regards. First, as the Supreme Court noted, the Nixon defense counsel's concession strategy was not the equivalent of a guilty plea because the defendant "retained the rights accorded a defendant in a criminal trial” and by forcing the prosecution to present aggressive evidence of guilt during the guilt phase, this evidence was “separated from the penalty phase, enabling the defense to concentrate that portion of the trial on mitigating factors.” Id. at 188, 125 S.Ct. 551. Second, the key factor undermining the Strickland claim in Nixon was that defense counsel conceded guilt as a strategic choice to help his mitigation presentation at *430 the penalty phase. In this case, as discussed below, Post's representation at the penalty phase likewise was inadequate.